# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CARLOS J. VEGA and** | : | **Civil No. 4:06-CV-2287** |
| **GENEVIEVE F. VICTOR,** | : | |
| **Co-Administrators of the Estate of** | : | |
| **David L. Vega, Deceased,** | : | |
| | : | |
| **Plaintiffs** | : | **(Judge Jones)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **CHIEF MATTHEW NESTOR,** | : | |
| **et al.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

This case, which comes before the court on motions for summary judgment filed by the defendants, presents sharply defined and contested disputes regarding material issues of fact. These factual disputes cast starkly different light upon an enigma that remains mired in controversy and shrouded in mystery. These stark factual controversies, in turn, are bound and defined by a simple, terrible, tragic truth: At 9:00 p.m. on November 28, 2004 David Vega was arrested by local police in Shenandoah, Pennsylvania. Eighty four minutes later Vega was dead, his life suddenly and violently ended in the cold antiseptic confines of a holding cell in the Shenandoah police department.

The circumstances of Vega's death define the issues in this case. But–contrary to the defendants' suggestion– the tragedy of Vega's short life, and the circumstances of his sudden death are grim factual controversies for which the defendants cannot be absolved by this court as a matter of law. Rather, the truth behind what transpired during those 84 fateful minutes in which David Vega's life came to a swift, violent end must be resolved by a jury as contested questions of fact. Accordingly, for the reasons set forth below, with two narrow exceptions, it is recommended that these motions for summary judgment be denied.

## II.   **Statement of Facts and of The Case**

### A.   **Factual Background**

Construing the evidence in a light most favorable to the plaintiffs, as we are required to do at this stage of the proceedings, the evidence in this case reveals the following facts:

In November of 2004, defendant Matthew Nestor, was the Chief of Police in Shenandoah, Pennsylvania. Defendant Jamie Gennarini, was a Shenandoah Borough police officer. (Doc. 180-10, pp. 12-15.)  As police officers, Nestor and Shenandoah held a public trust and had both sworn to uphold the law. Despite the oaths they had taken to enforce the law, there is substantial evidence that on a number of occasions in the past both Nestor and Gennarini, cloaked in the mantle of police authority, had

2

committed criminal acts, and condoned and concealed crimes by others, including racially motivated crimes of violence. United States v. Nestor, No 3:CR-09-397; United States v. Nestor and Gennarini, No. 3:CR-09-398.[1] In short, this evidence would permit a fact-finder in a civil lawsuit to infer from other episodes that Nestor and Gennarini are police officers who have engaged in a pattern of conduct that shared many features with what is alleged to have occurred on November 28, 2004–violations of civil rights, coupled with active concealment of those violations. The existence of this evidence, linking these two law enforcement officers to other similar acts, is an immutable truth which cannot be ignored and may well define the factual prism through which the events of November 28, 2004 are ultimately viewed.

At the time of these events, the Pennsylvania Borough Code generally provided that, "[t]he mayor of the borough shall have full charge and control of the chief of police and the police force, and he shall direct the time during which, the place where and the manner in which, the chief of police and the police force shall perform their

---

[1]In these cases Nestor and Gennarini as Shenandoah police officers were charged with a variety of offenses, including civil rights violations, and offenses involving obstruction of justice and falsification of police reports. United States v. Nestor, No 3:CR-09-397; United States v. Nestor and Gennarini, No. 3:CR-09-398. We recognize that these cases have ultimately been resolved, in some instances through acquittals, but we also recognize that these criminal outcomes do not define the admissibility of evidence in a civil lawsuit which is governed by a different, and lower, burden of proof.

duties," 53 P.S. § 46121. The Borough Code further provided that, "[t]he mayor may, however, delegate to the chief of police or other officers supervision over and instruction to subordinate officers in the manner of performing their duties." 53 P.S. § 46121. In this case there is some, albeit vigorously disputed, evidence that the mayor of Shenandoah had effectively delegated responsibility for addressing citizen complaints to the police department itself. Specifically, one witness has come forward reporting an alleged conversation with the Shenandoah mayor regarding abuses in the police department which occurred shortly before Vega's death. In this conversation the witness alleges that she was informed by the mayor that "if I rat out a police officer I will be the person that has to move out of town. . . ." (Doc. 208-6, p.53.) To the extent that responsibilities for police discipline and order had been effectively delegated to Chief Matthew Nestor in 2004, it is undisputed that Chief Nestor had not put into place any written policies or procedures relating to use of force, treatment of prisoners, or the need for accuracy in police reports. (Doc. 190-1, ¶186.)

By November, 2004 David Vega was an 18- year old man, whose short life had been marked by episodes of mental illness and encounters with local law enforcement. (Doc. 193-1, ¶¶1-3.) Indeed, by November of 2004, Vega's family reported that Vega as a youth had previously been in a physical encounter with defendant Matthew Nestor, an encounter in which Nestor allegedly struck Vega.(Doc. 208-2, p.41-42.)

4

On November 28, 2004, Vega, his brother and several other young men had spent the evening together drinking and watching football. (Doc. 178, ¶¶ 4, 5, 10, 11, 13, 17.) By approximately, 9:00 p.m., their revelry took on a somewhat more menacing aspect as David Vega struck an acquaintance, Scott Bloss, scuffled with his brothers, and became loud and disruptive outside the family's home on White Street, in Shenandoah. (Id.) As David Vega's behavior grew increasingly disruptive and agitated, Carlos Vega, Jr., contacted 911, requesting police assistance and stating "We need a cop over here." (Doc. 178, ¶¶33-35.) In response to questions from the 911 operator Carlos Vega reported that, "My brother snapped, and now he's all drunk, beating people up," and urged the operator to summon police, stating, "Send someone over here," "We need someone over here," and "This is ridiculous." (Id.) When asked to identify his brother who had "snapped" and was " beating people up," Carlos Vega replied: "Dave," "Dave Vega, Dave Vega. He's snapping the fuck out." (Id.)

In response to this report defendant Gennarini and another police officer were despatched to the scene (Doc. 178, ¶¶ 36 and 37), where they confronted David Vega, members of his family and other bystanders who were at the scene and had been drawn to the commotion. ( Doc. 178, ¶¶18, 19, 22-25, 27.) What happened next is the

subject of some dispute[2], although the following facts appear undisputed:

Defendant Gennarini and other police at the scene observed David Vega on the street in what appeared to be an inebriated state. Police also confirmed that David Vega had been in physical altercations with others shortly before the police arrived at the scene,  (Doc. 178, ¶¶ 4, 5, 10, 11, 13, 17), although the parties dispute the degree of violence exhibited in this altercation, and police determined that David Vega's loud behavior had been sufficiently disruptive that it had drawn the attention of neighbors and passers-by. (Doc. 178, ¶¶18, 19, 22-25, 27.) Confronted with this information, and the earlier 911 report that Vega had "snapped, and now he's all drunk, beating people  up," shortly after 9:00 p.m. on November 28, 2004, defendant Gennarini arrested Vega, charging him with public drunkenness, disorderly conduct, simple assault and other related offenses. (Doc. 216-4, pp.32-35.)

What transpired over the next 84 minutes is shrouded in controversy.  For  his part, defendant Gennarini has stated that he transported Vega to the Shenandoah police department, and placed him in a holding cell at approximately 9:05 p.m.(Docs.

_____

[2]In particular, the parties dispute whether David Vega was verbally abusive or physically threatening in his encounter with police, and contest whether Vega's family, who had earlier called 911 to report Vega's disruptive conduct, opposed Vega's arrest that evening. (Compare Doc. 178,  ¶¶ 38-64, with Doc. 206  ¶¶38-64.)

180-10 and 11and 216-4.)[3] According to Gennarini, and two other police department witnesses on duty that night, Vega remained alone and unmolested in this cell while police prepared reports and other documents charging Vega with these offenses. (Id., Doc. 180, Exs 12 and 14, deposition testimony of Edward Buhl and Ray Nestor.) While Gennarini and the other police witnesses insisted that Vega remained unharmed during this time, they have acknowledged that Vega was angry, agitated and was shouting obscenities at the police officers from his holding cell throughout the evening until very shortly before his death.(Id.)

Gennarini then reported that he and a fellow officer left the police station at approximately 9:20 p.m. to respond to another domestic disturbance report at the Vega residence on White Street. (Id., Doc. 216-4, pp.29-31.) Returning to the police station at 9:30 p.m., Gennarini alleges that he checked on Vega, who was still in the holding cell and was still persisting in shouting obscenities at the police. (Id.)Gennarini reported that he continued to periodically check Vega, last checking Vega's cell at approximately 10:00 p.m. (Id.) these episodes brought Gennarini into brief, isolated contact with Vega.  During all of this time, Gennarini has stated that Vega remained, angry, agitated and profane.(Id.)

---

[3]In particular this chronology is derived from the police report prepared by Gennarini which purports to describe the events of November 28, 2004. (Doc. 216-4, pp.29-31)

According to police, sometime after 10:00 p.m. Vega's holding cell grew quiet. When another police officer, Raymond Nestor, looked into Vega's holding cell at 10:24 p.m.– a mere 84 minutes after this law enforcement encounter first began and only a handful of minutes after police reported that Vega was alive, shouting and belligerent in the cell–he reportedly found Vega unconscious and asphyxiated, with a belt drawn tightly around his neck.(Id., Doc. 216-4, pp. 29-31.) Gennarini and the other police at the scene have stated that they rushed to Vega's aid, cut him down from the cell bars, and attempted to administer first aid, but to no avail. Vega was dead.(Id., Doc. 216-4, pp. 29-31.)

Defendant Matthew Nestor, the Shenandoah police chief, was not present when Vega was arrested and was not on-duty at the police station when Vega died, but arrived at the scene within 15 minutes of the reported discovery of Vega's body. (Id., Doc. 216-4, pp. 29-31.) Matthew Nestor swiftly took command at the scene and within minutes of arriving at the police station was publicly pronouncing Vega's death a suicide. (Id., Doc. 216-4, pp. 29-31.) Thus, by 11:00 p.m. on November 28, 2004–a mere two hours after Vega's arrest and only 36 minutes after police reported the initial discovery of Vega's lifeless body–Nestor arrived at the home of Vega's mother, Genevieve Victor, and delivered the stunning news that her son had allegedly committed suicide in police custody. (Id., Doc. 216-4, pp.29-31.)

While Nestor publicly declared Vega's death a suicide, there is evidence that Nestor confessed to a far more sinister set of facts in private. For a number of years Matthew Nestor and Angela Pleva engaged in a tempestuous relationship. Pleva, who is now estranged from Nestor, alleges that in the course of this relationship Nestor made admissions to her regarding his culpability in the death of David Vega. According to Pleva, shortly after Vega's death, Nestor came to her home to visit the child they have together. Having heard of Vega's death, Pleva claims that she questioned Nestor about this incident, "and he just looked at me right in the eyes and said, 'Things got out of hand and we killed him.'" (Doc. 208-12, p.4.) Pleva alleges that when she asked who was responsible for Vega's death, Nestor replied "Me and Jamie [Gennarini]." (Id.) Pleva further asserted that several years later, when the FBI was investigating civil rights violations by Nestor, he returned to her home and in a surreptitious conversation expressed concern that federal authorities were looking into his involvement in the Vega death and other civil rights violations. (Id.)

Despite these alleged private admissions, at the time of this incident Chief Nestor took the public position that Vega had committed suicide in his cell. While the local coroner accepted these reports and found suicide to be the cause of death in Vega's case, (Doc. 180, Ex. 2),other forensic evidence provides a very different, and far darker, account of Vega's last minutes of life. Two forensic pathologists have

9

concluded that Vega's death was not a suicide. Instead, they have found that Vega

suffered blows to the head that contributed to his death, and that the police account of

the circumstances surrounding Vega's death does not comport with the forensic

evidence. (Docs. 208-12, and 208-14.) One of these forensic experts, Dr. John Shane,

conducted an autopsy of David Vega two days after his death. (Doc. 208-12.) The

report of this autopsy contradicts the official police account of this death in two

material respect. First, Dr. Shane did not find physical evidence which would have

been consistent with the reported cause of death, suicide by hanging. (Id.) Instead, Dr.

Shane found that the condition of Vega's neck and throat was inconsistent with death

by hanging. Furthermore, Dr. Shane's autopsy revealed significant evidence that Vega

died as a result of massive cerebral hemorrhaging due to multiple blows to both the

right and left side of his head. (Id.) Dr. Shane's findings were corroborated by Dr.

Cyril Wecht, a second forensic pathologist who also concluded that the injuries Vega

suffered were not the result of a hanging suicide, but rather indicated that Vega had

been beaten severely about the head, and this beating was the leading proximate cause

of Vega's death. (Doc. 208-14.)[4]

---

[4]We note that the defendants have challenged these forensic findings, and
have argued that the findings of Dr. Wecht and Dr. Shane are wholly inconsistent.
Our own review of these reports, and other forensic evidence reveals that there
may be some dispute between the two experts regarding whether the blows to
Vega's head caused, or simply contributed, to his death. However, both forensic

B.    **Litigation History**

It is against this factual background that the plaintiffs as co-administrators of

Mr. Vega's estate commenced this action on November 26, 2006, by filing a

complaint with this court. (Doc. 1.) In its original form, the plaintiffs' complaint

named twelve defendants, both known and unknown, and set forth some fifteen claims

and causes of action under state and federal law. (Id.) Currently, three defendants

remain named in this complaint–Matthew Nestor, James Gennarini and the Borough

of Shenandoah.

As to these defendants, the plaintiffs' claims fall into several general categories:

First, with respect to the individual defendants, Nestor and Gennarini, the plaintiffs

have lodged both constitutional and common law claims based upon allegations of

false arrest and imprisonment. (Doc. 1, Counts II, IV and XII.) The plaintiffs then

have filed a battery of constitutional and common law claims premised on the use of

excessive force against Vega, excessive force that resulted in Vega's injury and death.

(Doc. 1 Counts III, V, VII, XI, XIV, and XV.) The plaintiffs' complaint further alleges

that Nestor and Gennarini engaged in a civil conspiracy to commit these civil rights

---

experts have rejected suicide as a cause of death based upon the medical evidence.
Both experts have found that Vega suffered head injuries that are inconsistent with
police reports, and both experts have concluded that those head injuries played a
role in Vega's death.

violations and common law torts. (Doc. 1, Counts VIII and XIII.) With respect to these various claims, the complaint seeks to hold these individual defendants liable as principals, and co-conspirators in tortious activity. In addition, the complaint purports to hold supervisory officials like Chief Nestor liable in their supervisory capacity. (Doc. 1, Count VI.) Finally, the complaint asserts claims against these individual defendants based upon alleged violations of the Pennsylvania constitution. (Doc. 1, Count X.)

Having asserted these claims against the individual defendants, the complaint then brings a cause of action against one institutional defendant, the Borough of Shenandoah. (Doc. 1, IX.) This count of the plaintiffs' complaint seeks to hold the borough accountable for these alleged civil rights violations because the borough allegedly adopted of custom and policy of deferring to the police on matters relating to police misconduct, and failed to adequately oversee and train police officers. (Id.)

The parties have engaged in lengthy discovery proceedings in this case. At the close of discovery each of the defendants moved for summary judgment on all of the plaintiffs' claims. (Docs. 177, 189 and 192.) These summary judgment motions have been extensively briefed by the parties, (Docs. 178, 179, 180, 190, 191, 193-201, 206-208, 216, 217, 221, 225, and 228), and are now ripe for resolution.

For the reasons set forth below, we recommend that the court grant the

12

defendants' summary judgment motions on the following counts of the plaintiffs' complaint: Counts II, IV and XII of the plaintiffs' complaint, which relate to allegations of false arrest, and Count X of the complaint, which asserts claims based upon alleged violations of the Pennsylvania constitution.

As to the remaining counts of the complaint, we recommend that the motions be denied since there are substantial unresolved disputes regarding material issues of fact which preclude summary judgment at this time.

## II.   <u>Discussion</u>

### A.   <u>Rule 56–The Legal Standard.</u>

The defendants have moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." <u>Univac Dental Co. v. Dentsply Int'l, Inc.</u>, No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence supporting the

nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995). This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact which would preclude summary judgment. With respect to such claims, it is well-settled that: "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial." Shelton v. University of Medicine & Dentistry of N.J., 223 F.3d 220, 223, n.2 (3d Cir. 2000), citing  Stelwagon Mfg. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275, n.17 (3d Cir. 1995). In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a court may only consider evidence which is admissible, and that a party can not rely on hearsay evidence when opposing a motion for summary judgment. See Buttice v. G.D. Searle & Co., 938 F.Supp. 561

15

(E.D.Mo.1996). Additionally, a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay. See Burgess v. Allstate Ins. Co., 334 F.Supp.2d 1351 (N.D.Ga.2003). The mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage. Henry v. Colonial Baking Co. of Dothan, 952 F.Supp. 744 (M.D.Ala.1996).

Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005). Thus, a party may not rely upon inadmissible hearsay assertions to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. See, e.g., Synthes v. Globus Medical, Inc., No. 04-1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc., 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple

16

Univ., 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Yet, while "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment," Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995), and "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions," Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985), the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007). Therefore, in a case where the parties' pleadings reveal disputes regarding the admissibility of specific evidence, the principles governing consideration of summary judgment motions –which enjoin us to examine the evidence in a light most favorable to the party opposing the motion–also call upon us to resolve all genuine disputes concerning the admissibility of specific items of evidence in favor of the party opposing the motion.

This principle applies with particular force to factual disputes which relate to

matters of motive or intent. In this regard, it is well-settled that: "The motive or absence of motive of a party to engage in conduct alleged by another party is relevant to determining whether a genuine issue of fact exists. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 596 (1986)." Berda v. CBS Inc., 800 F.Supp. 1272, 1276 (W.D.Pa), aff'd., 975 F.2d 1548 (3d Cir. 1992). Furthermore, when these issues of motivation and intent turn, in part, upon consideration of other acts of a party, the admissibility of such evidence is guided by Rule 404(b) of the Federal Rules of Evidence, which provides that:

> Other Crimes, Wrongs, or Acts.-Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ... .

Fed. R. Evid. 404(b).

It is well-settled that "[t]rial court rulings under Rule 404(b) are reviewed for an abuse of discretion." United States v. Balter, 91 F.3d 427, 437 (3d Cir. 1996). Typically, "[a]n abuse of discretion occurs only where the district court's decision is 'arbitrary, fanciful, or clearly unreasonable'—in short, where 'no reasonable person would adopt the district court's view.' United States v. Starnes, 583 F.3d 196, 214 (3d Cir.2009)." United States v. Green, 617 F.3d 233, 239 (3d Cir. 2010). This discretion

is guided, however, by certain basic principles. Foremost among these principles is the concept that Rule 404(b) is "'inclusionary.' It state[s] a general rule of admissibility, subject to a single exception—evidence of other wrongful acts was admissible so long as it was not introduced *solely* to prove criminal propensity." United States v. Green, supra, 617 F.3d at 244.

Rule 404(b)'s "inclusionary" principles permitting the introduction of other acts by a party when those acts are relevant for purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, "applies equally to civil, as well as criminal, cases. Fed.R.Evid. 404 advisory committee's note." Ansell v. Green Acres Contracting Co., Inc., 347 F.3d 515, 520 (3d Cir. 2003). Moreover, a party cannot resist the introduction of other acts evidence at trial by simply asserting that these other acts occurred after the events that are the subject of the instant lawsuit. Bad acts occurring after the events in the lawsuit are "encompassed by the plain text of Rule 404(b) which addresses 'other ... acts,' not just prior bad acts. See United States v. Echeverri, 854 F.2d 638, 645 (3d Cir.1988) ('[T]here may be cases in which evidence of subsequent ... acts may properly be admitted under Rule 404(b) [to show knowledge or intent.]')" Ansell v. Green Acres Contracting Co., Inc., 347 F.3d 515, 520 (3d Cir. 2003). Similarly, the fact that a criminal trial involving these prior acts may have resulted in an acquittal does not

automatically exclude this evidence in a civil lawsuit which is governed by a different and lower burden of. proof.  See Galbraith v. Hartford Fire Ins. Co., 464 F.2d 225 (3d Cir. 1972).

Instead, under the inclusionary approach to consideration of such evidence adopted by Rule 404(b):

> For other acts evidence to be admissible under the exceptions listed in Rule 404(b), (1) the evidence must have a proper purpose; (2) it must be relevant under Rule 401 and 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it was admitted. United States v. Sampson, 980 F.2d 883, 886 (3d Cir.1992) (citing Huddleston v. United States, 485 U.S. 681, 691-92, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)).

Ansell v. Green Acres Contracting Co., Inc., 347 F.3d 515, 520 (3d Cir. 2003).

The parties' pleadings reveal a host of hotly disputed evidentiary issues. These issues relate, in part, to the admissibility of Rule 404(b) evidence pertaining to other acts of the individual defendants, acts that the plaintiffs allege are part of a common pattern of conduct by these defendants involving two significant factual elements which the plaintiffs assert are also present in this case: (1) violations of civil rights by the defendant Shenandoah police officers; and (2) calculated concealment of those civil rights violations. The parties also have sharply contrasting views regarding the

admissibility of the competing forensic studies done in this case, matters which are the subjects of separate motions *in limine*. (Docs. 231 and 238.)

At this juncture it is emphatically not the role of this court to endeavor to ultimately resolve these evidentiary disputes, particularly as they relate to matters regarding the admissibility of Rule 404(b) evidence, since those judgments rest in the sound discretion of the trial judge. Indeed, the United States Court of Appeals for the Third Circuit has often cautioned against this practice, observing that "pretrial [rulings regarding evidentiary] exclusions should rarely be granted. . . . Excluding evidence as being more prejudicial than probative at the pretrial stage is an extreme measure that is rarely necessary, because no harm is done by admitting it at that stage." In re Paoli R. Yard PCB Litig., 916 F.2d 829, 859 (3d Cir. 1990). Instead, at this juncture, where we are assessing motions for summary judgment, our obligation is to view the evidence in a light most favorable to the party opposing the motion. Performing this obligation, and recognizing the broadly inclusionary quality of Rule 404(b), we conclude for purposes of this motion only that we should view the evidence favorably to the plaintiffs, consider this case in light of the available potential Rule 404(b) evidence, and assume the admissibility of the conflicting forensic autopsy results and findings, when determining whether the defendants are entitled to summary judgment..

## B.   The Defendants' Summary Judgment Motions Should Be Granted, In Part

Even with our discretion cabined by Rule 56's requirement that summary judgment should be entered only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c), we conclude that summary judgment is appropriate here on two of the plaintiffs' outstanding claims. These claims, as to which we recommend that judgment be entered in favor of the defendants, are discussed separately below:

### 1.   The Plaintiffs' State Constitutional Claims Should be Dismissed.

At the outset, to the extent that the plaintiffs seek damages under the Pennsylvania constitution, (Doc. 1, Count X), it must be noted that:

> Pennsylvania law does not include a statutory equivalent to 42 U.S.C. § 1983, which provides a cause of action for damages because of a federal constitutional violation. Moreover, the question of whether the Pennsylvania Constitution provides a cause of action for damages remains unanswered. Underwood v. Beaver Cnty. C.Y.S., Civ. A. No. 03-1475, 2005 U.S. Dist. LEXIS 23012, at *7 (W.D.Pa. Oct. 7, 2005). Nevertheless, a majority of other district courts in this circuit that have decided the issue have concluded that money damages are not available for claims under the Pennsylvania Constitution .See Ryan v. General Machine Prods., 227 F.Supp.2d 585, 595 (E.D.Pa.2003) (stating that federal courts in the Court of Appeals for the Third Circuit have concluded that there is no right to money damages under the

22

Pennsylvania Constitution); see also Douris v. Schweiker, 229 F.Supp.2d
391, 405 (E.D.Pa.2002); Lees v. West Greene Sch. Dist., 632 F.Supp.
1327, 1335 (W.D.Pa.1986). Although monetary relief is unavailable,
"other remedies, such as declaratory or injunctive relief ... are ...
remedies under the Pennsylvania Constitution." Jones v. City of
Philadelphia, 890 A.2d 1188, 1215-16 (Pa.Commw.Ct.2006) (discussing
the lack of a cause of action for damages under the Pennsylvania
Constitution and declining, "without benefit of legislative action," to
create such a cause of action.).

O'Hara v. Hanley, No. 08-1393,  2009 WL 2043490, 9 (W.D.Pa. July 8, 2009).

Thus, the state constitution simply may not provide legal footing for any damages

claims like those made by the plaintiffs in this case. Accordingly, this damages claim

grounded in alleged violations of the Pennsylvania constitution should be dismissed

for failure to state a claim upon which relief can be granted.

## 2.    The Plaintiffs' False Arrest Claims Should Also Be Dismissed

In this case, the plaintiffs have also lodged both constitutional and common law

claims based upon allegations of false arrest and imprisonment of Vega by the police

on November 28, 2004. (Doc. 1, Counts II, IV and XII.) While some of these claims

are cast as common law torts, and others are brought as constitutional claims, the gist

of all of these claims is that the defendants violated Vega's constitutional rights

through their unlawful arrest and malicious prosecution of the plaintiff. These claims

implicate Walker's rights under the Fourth Amendment to the United States Constitution, which provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and now Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.   Under the Fourth Amendment, an arrest without probable cause is a constitutional violation that may be redressed under 42 U.S.C. § 1983.  See Walmsley v. Philadelphia, 872 F.2d 546, 551 (3d Cir. 1989) (citing Patzig v. O'Neill, 577 F.2d 841, 848 (3d Cir. 1978).  However, in order to make out a false arrest claim, a plaintiff must demonstrate that police lacked probable cause to arrest.  Groman v. Twp. of Manalpan, 47 F.3d 628, 634 (3d Cir. 1995). Similarly:

> To prove malicious prosecution under section 1983, a plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003)(emphasis added).

Thus, whether characterized as a false arrest, or couched in terms of malicious prosecution, proof that probable cause was lacking is essential to any §1983 claim

24

arising out of the arrest and prosecution of an individual.  For purposes of the Fourth Amendment, probable cause to arrest exists "whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." U.S. v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)).  An arrest by a police officer without a warrant "is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004).  In conducting an inquiry into whether probable cause to arrest existed, a court should consider the totality of the circumstances presented, and "must assess the knowledge and information which the officers possessed at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest." United States v. Stubbs, 281 F.3d 109, 122 (3d Cir. 2002).

Although "[t]he probable-cause standard is incapable of precise definition or quantification," Maryland v. Pringle, 540 U.S. 366, 371 (2003), all interpretations of probable cause require "a belief of guilt that is reasonable as opposed to certain." Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005) (citing Hill v. California, 401 U.S. 797, 804 (1971)). Probable cause "does not require the same type of specific evidence of each element of the offense as would be needed to support a

conviction." Wright, 409 F.3d at 602 (quoting Adams v. Williams, 407 U.S. 143, 149 (1972)). Accordingly, the evidentiary standard for probable cause is significantly lower than that required for conviction. Id. (citing Michigan v. DeFillippo, 443 U.S. 31, 36 (1979)); see also Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000) (holding that probable cause requires only a "fair probability" that a person committed the relevant crime). Because an arrest is made with probable cause if at the moment it was made the facts and circumstances within the officer's knowledge "were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense," Beck v. Ohio, 379 U.S. 89, 91 (1964), the constitutional validity of an arrest does not turn on whether the suspect ultimately is found to have actually committed any crime. Johnson v. Campbell, 332 F.3d 199, 211 (3d Cir. 2003). Although officers on the scene may draw inferences and make deductions that might elude an untrained person, United States v. Cortez, 449 U.S. 411, 418 (1981), "an officer's inferences and deductions can only justify a warrantless arrest if the[y] satisf[y] [the] burden of establishing the probable cause necessary to support the arrest," Myers, 308 F.3d at 255. However, where there are sufficient, undisputed, objective facts available to the arresting officer at the time of the arrest to justify a reasonable belief that a crime has been committed by the person to be arrested, that arrest is entirely proper, and the arresting officer is entitled to summary judgment on

26

any false arrest claim. Hughes v. Shestakov, 76 F.App'x 450 (3d Cir. 2003).

Adopting this standard of review, we find that the following material facts are essentially undisputed: On the evening of November 28, 2004, David Vega, an 18 year-old youth, had been drinking with friends when he became involved in an altercation, striking an acquaintance, Scott Bloss, scuffling with his brothers, and becoming loud and disruptive outside the family's home on White Street, in Shenandoah. As David Vega's behavior grew increasingly disruptive, Carlos Vega, Jr., contacted 911, requesting police assistance and stating "We need a cop over here." (Doc. 178, ¶¶33-35.) In response to questions from the 911 operator Carlos Vega reported that "My brother snapped, and now he's all drunk, beating people up," and urged the operator to summon police, stating, "Send someone over here," "We need someone over here," and "This is ridiculous." (Id.) When asked to identify his brother who had "snapped" and was "beating people up," Carlos Vega replied: "Dave," "Dave Vega, Dave Vega. He's snapping the fuck out." (Id.) When defendant Gennarini and another police officer arrived at the scene they confronted David Vega, members of his family and other bystanders who had been drawn to the commotion. Defendant Gennarini and other police at the scene observed David Vega on the street in what appeared to be an inebriated state; confirmed that David Vega had been in a physical altercation with others shortly before the police arrived at the scene; and

27

determined that David Vega's loud behavior had been sufficiently disruptive that it had drawn the attention of neighbors and passers-by. Presented with this information, and the earlier 911 report that Vega had "snapped, and now he's all drunk, beating people up, " shortly after 9:00 p.m. on November 28, 2004, defendant Gennarini arrested Vega, charging him with public drunkenness, disorderly conduct, simple assault and other related offenses.

We recognize that the parties dispute other, collateral matters such as whether David Vega was verbally abusive or physically threatening in his encounter with police, or whether Vega's family, who had earlier called 911 to report Vega's disruptive conduct, opposed Vega's arrest that evening. However, none of these collateral factual disputes alter the fundamental facts that at 9:00 p.m. on November 28, 2004, Vega presented to police as someone who was publicly under the influence of alcohol, as someone who had been involved in a physical altercation with others, and as someone whose behavior was publicly disruptive. Therefore, on these undisputed facts, there was probable cause to arrest Vega for the offenses of public drunkenness, disorderly conduct, and simple assault. Since there were sufficient objective facts for the police officers, upon arriving on the scene, to reasonably believe that Vega had committed these offenses, those officers had probable cause to arrest Vega and summary judgment is appropriate on the false arrest claims set forth

in this complaint. <u>Hughes v. Shestakov</u>, 76 F.App'x 450 (3d Cir. 2003).

**C.    Summary Judgment Should Not Be Granted On Behalf of the Individual Defendants With Respect to the Plaintiffs' Excessive Force, Assault, Wrongful Death and Conspiracy Claims, Since There Are Disputed Material Issues of Fact With Respect to Those Claims**

As for the remaining claims advanced by the plaintiffs against defendants Gennarini and Nestor, we find that disputed material issues of fact preclude the entry of summary judgment in this case. These remaining claims consist of an array of constitutional and common law claims premised on the use of excessive force against Vega, excessive force that resulted in Vega's injury and death, (Doc. 1 Counts III, V, VII, XI, XIV, and XV) , as well as claims that Nestor and Gennarini engaged in a civil conspiracy to commit these civil rights violates and common laws torts. (Doc. 1, Counts VIII and XIII.) With respect to these various claims, the complaint seeks to hold these individual defendants liable as principals, and co-conspirators in tortious activity. In addition, the complaint purports to hold supervisory officials like Chief Nestor liable in their supervisory capacity. (Doc. 1, Count VI.)

Like the plaintiffs' false arrest claim, these excessive force claims are grounded in the protections of the Fourth Amendment, which provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures, shall not be violated...." In order to "state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999) (citing Brower v. County of Inyo, 489 U.S. 593, 599 (1989)). An officer seizes a person when he "restrains the freedom of a person to walk away[.]" Tennessee v. Garner, 471 U.S. 1, 7 (1985).

Claims alleging the excessive use of force in the course of arrest are evaluated under the Fourth Amendment's objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). When considering such claims, the reasonableness of a particular use of force is dependent upon context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," while recognizing "that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary." Id. at 396-97. When an officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others," the use of deadly force may be permissible. Garner, 471 U.S. at 11.

Furthermore, district courts should consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect

poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. Weighing these various factors "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Curley, 499 F.3d at 207 (quoting Graham, 490 U.S. at 396). Such balancing "must be conducted in light of the facts that were available to the officer." Id. (citing Maryland v. Garrison, 480 U.S. 79, 85 (1987)). In addition to the considerations that the Supreme Court recognized in Graham, the Third Circuit has identified other relevant factors that may apply in particular cases, including "the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997). Another factor of potential relevance is "the possibility that the persons subject to the police action are violent or dangerous." Estate of Smith v. Marasco, 318 F.3d 497, 515 (3d Cir. 2003).

Typically, the question of whether a particular use of force was reasonable is a matter of fact for the jury to determine. Thus, summary judgment may only be entered if the court "'resolves all factual disputes in favor of the plaintiff and concludes that the use of force was objectively reasonable under the circumstances.'"

Dull v. W. Manchester Twp. Police Dep't, 604 F. Supp. 2d 739, 749 n.5 (M.D. Pa. 2009) (Conner, J.) (quoting Graveley v. Speranza, 219 F. App'x 213, 215 (3d Cir. 2007)).

Moreover, with respect to excessive force claims against supervisory officials like those advanced here by Vega against defendant Matthew Nestor, the plaintiffs must show that the supervisory defendant actively deprived the plaintiff of a right secured by the Constitution.  Morse v. Lower Merion School Dist., 132 F.3d 902 (3d Cir. 1997); see also Maine v.Thiboutot, 448 U.S. 1 (1980). Constitutional tort liability is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice. Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997).

In particular, with respect to prison supervisors it is well-established that:

> "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).

Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).

As the Supreme Court has observed:

> Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.* . . . See <u>Monell v. New York City Dept. of Social Servs.</u>, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also <u>Dunlop v. Munroe</u>, 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); <u>Robertson v. Sichel</u>, 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution

<u>Ashcroft v. Iqbal</u>,  129 S.Ct. 1937, 1948 (2009).

Judged in light of these controlling legal tenets, we find that disputed material issues of fact preclude summary judgment at this time with respect to the individual defendants. Turning first to defendant Gennarini, when we construe the evidence in a light most favorable  to the plaintiffs, that evidence would permit an inference by a fact-finder that Gennarini had, over time, engaged in a pattern of behavior marked by abuse of his office, violations of civil rights, and the concealment of those civil rights violations. Viewed in the context of this broader mosaic of proof, a fact-finder could conclude that the events of November 28, 2004, were yet another example of this pattern of behavior by Gennarini.

33

Indeed, the events surrounding Vega's death could be seen by a fact-finder as fitting precisely into this pattern. Vega came into Gennarini's custody at 9:00 p.m. on November 28, 2004. Eighty four minutes later he was dead. While Gennarini and other police have provided a wholly exculpatory explanation for Vega's death, suicide by hanging, some forensic evidence flatly contradicts this explanation, noting that Vega's neck injuries are not consistent with hanging, and that Vega suffered multiple head injuries consistent with blunt force trauma and beating. This forensic evidence, if credited by a fact-finder, would permit an inference and conclusion that Vega was beaten while in Gennarini's custody, and that Gennarini then actively concealed this violence through false reports as he had allegedly done on other occasions.

In reaching this conclusion we do not in any way suggest that this is the only permissible  interpretation of these disputed facts. It is not. Indeed, the defendants have argued with great force and vigor that this interpretation of events is wholly unpersuasive. However, the defendants' arguments in this regard, whatever persuasive force they may ultimately possess, do not eliminate disputed issues of fact. Rather, they sharply define those factual disputes. Given that the contested evidence in this case, viewed in a light most favorable to the plaintiffs,  would permit such a factual finding, Gennarini simply is not entitled to summary judgment in his favor on any of these excessive force claims set forth in the plaintiff's complaint.

34

These same principles would apply to the plaintiffs' pendant state common law battery and wrongful death claims. Like the constitutional excessive force claims, these state tort claims present a host of disputed factual issues relating to the precise circumstances of David Vega's death. In particular, with respect to the plaintiffs' wrongful death claim, Pennsylvania law provides that a wrongful death suit may be brought only "for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime." 42 Pa. C.S. § 8301. Police officers are immune from state tort liability for acts within the scope of their employment except when the alleged conduct involves "a crime, actual fraud, actual malice, or willful misconduct." 42 Pa. C.S. § 8550. Willful misconduct "has been defined . . . [as] conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow. . . . In other words, the term willful misconduct is synonymous with the term 'intentional tort.'" Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994).

Here the evidence could permit an inference that Vega was beaten severely about the head while in Gennarini's custody, and died within 84 minutes of his arrest as a result of these head injuries. If a fact-finder drew this inference from the evidence, then it would follow that defendant Gennarini's account of these events was false, and

was part of a pattern of such falsehoods by the defendant, falsehoods designed to

conceal this civil rights violation. Such findings, which would be permitted but not

compelled by this disputed evidence, would constitute "willful misconduct," 42 Pa.

C.S. § 8550, which would expose Gennarini to civil liability under Pennsylvania's

wrongful death statutes.[5]

While there is no evidence that Matthew Nestor was a direct participant in

Vega's arrest, we also conclude that this disputed evidence would permit, but not

---

[5]Finally, we note that in addition to various excessive force claims, (Doc. 1, Counts III and VII), the plaintiffs have brought a claim based upon denial of medical care. (Doc. 1, Count V.) To establish a violation of his constitutional right to adequate medical care in accordance with this standard, Vega is required to point to evidence that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). Given the undisputed evidence which shows that medical personnel were summoned to the Shenandoah police department within 90 minutes of Vega's arrest this claim may be problematic standing in isolation, particularly if the lack of medical care is not directly linked to claims that police also used excessive force against Vega. However, the plaintiffs' complaint narrowly alleges this claim, asserting that police are liable solely because they permitted the use of excessive force, and then denied timely care to Vega. Cast in this very narrow fashion, we believe that this count of the plaintiffs' complaint also presents disputed issues of fact which prevent the entry of summary judgment.

compel, a fact-finder to hold Matthew Nestor personally liable in his supervisory capacity for these acts. We reach this conclusion, even though we acknowledge that Nestor does not appear to have been directly involved in Vega's arrest or present at the precise moment of his death, because we find that there are disputed factual issues relating to whether Nestor may be held liable in his supervisory capacity for this death.

For officials like Nestor, supervisory liability stems from "[p]ersonal involvement [which] can be shown through allegations of personal direction or of actual knowledge and acquiescence. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).  Thus, typically in order to establish supervisory liability, a plaintiff "must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that the unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisory practice or procedure." Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989).

Viewing Nestor's potential culpability through the lens prescribed by Rule 56,

which calls upon us to "consider all evidence in the light most favorable to the party opposing the motion," <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007), we find that there are disputed material issues of fact which must be resolved in order to determine Nestor's personal culpability in this matter. In particular, the plaintiffs' have presented a witness, Angela Pleva, who claims that she questioned Nestor about this incident shortly after Vega's death, "and he just looked at me right in the eyes and said, 'Things got our of hand and we killed him.'" (Doc. 208-12, p. 4.) Pleva alleges that when she asked who was responsible for Vega's death, Nestor replied "Me and Jamie [Gennarini]." (<u>Id</u>.)  Pleva further asserted that several years later, when the FBI was investigating civil rights violations by Nestor, he returned to her home and in a surreptitious conversation expressed concern that federal authorities were looking into his involvement in the Vega death and other civil rights violations. (<u>Id.</u>)

These statements attributed to Nestor by Pleva are clearly admissible against defendant Nestor as declarations of a party-opponent under Rule 801(d)(2) of the Federal Rules of Evidence.[6] Moreover, these alleged admissions plainly create a

---

[6] The parties have also devoted great attention in their pleadings to the issue of whether Nestor's alleged statement that "Me and Jamie [Gennarini]" killed Vega is also separately admissible against defendant Gennarini under the co-conspirator exception to the hearsay rule, Rule 801(d)(2)(E) of the Federal Rules of Evidence. In order for an out-of-court statement to meet the co-conspirator exception: "the

disputed factual issue regarding whether Nestor as chief of police had the requisite "actual knowledge and acquiescence," Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005), regarding the wrongful circumstances of Vega's sudden violent death to trigger supervisory liability in this case.

Yet, in reaching this conclusion we acknowledge that the defendants have assailed Pleva's credibility with great force and vigor. These arguments, however, go to the ultimate persuasive quality of this evidence; they do not provide grounds for totally ignoring or discounting this proof. Since this proof presents a disputed factual issue relating to a matter which may well define Nestor's personal liability in this case, summary judgment is not appropriate. Rather, the plaintiffs' claims, and Nestor's defense to those claims, must be resolved as a factual matter by a jury.[7]

_____

district court must find by a preponderance of the evidence that: (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy. United States v. Ellis, 156 F.3d 493, 496 (3d Cir.1998); United States v. Vega, 285 F.3d 256, 264 (3d Cir.2002)." United. States  v. Weaver, 507 F.3d 178, 181 (3d. Cir. 2007).  Because we believe that sufficient independent evidence exists in this case to defeat these particular summary judgment motions without consideration of this statement as co-conspirator hearsay, we decline to resolve this issue, leaving this evidentiary ruling to the sound discretion of the district court at trial.

[7]Finally, we conclude that this evidence, as a whole, also creates disputed factual issues regarding whether Nestor and Gennarini engaged in concerted action

### D.   The Borough of Shenandoah is Not Entitled to Summary Judgment in the Plaintiffs' Monell Claims

Having addressed the claims of the individual defendants, we turn to the motion for summary judgment filed by the Borough of Shenandoah. That motion argues that the borough is entitled to judgment as a matter of law on the plaintiffs' municipal liability claims because the plaintiffs have failed to make the exacting showing required for such municipal liability in civil rights matters.

Municipalities and other local governmental entities may not be held liable under § 1983 for the acts of their employees under a theory of *respondeat superior* or vicarious liability.  Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1948 (2009); see also Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991).  However,

---

with respect to this matter which would warrant civil liability as conspirators. As we have noted the evidence would permit an inference that the individual defendants at various times indulged in a pattern of concerted behavior involving both civil rights violations and the concealment of those violations. The events of November 28, 2004 could be seen as fitting in this pattern, since some of the forensic evidence rebuts the jointly proffered explanations tendered by Nestor and Gennarini that Vega died as a result of a suicide hanging. That admittedly disputed forensic evidence would also permit a finding that Vega's death was the result of a beating administered during the 84 minutes when he was in police custody, and would allow a fact-finder to conclude that the individual defendants' claims of suicide were knowingly false exculpatory statements made jointly by the defendants as part of a tortious conspiracy. In reaching this conclusion, however, we emphasize that we are not considering  Nestor's alleged statement that "Me and Jamie [Gennarini]" killed Vega as co-conspirator hearsay, but rather leave that evidentiary issue to the judgment of the trial judge.

a municipality may be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury" to prevail. Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403 (1997). This custom must be "so widespread as to have the force of law." Id. at 404; see also Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (a policy is an official proclamation or edict of a municipality, while a custom is a practice that is "so permanent and well settled as to virtually constitute law") (quoting Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted).

The plaintiff must further "allege that a 'policy or custom' of [the defendants] was the 'moving force' behind the [constitutional] violation." Grayson v. Mayview State Hosp., 293 F.3d 103, 107 (3d Cir. 2002) (citing Brown, 520 U.S. at 404). A municipality can be held liable on the basis of failure to train when "that failure amounts to 'deliberate indifference . . . [of the constitutional] rights of persons. . . .'" Woloszyn v. County of Lawrence, 396 F.3d 314, 324 (3d Cir. 2005) (citations omitted). There must also be a causal nexus, in that the "'identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury.'" Id.

at 325 (citations omitted).  In summary, analysis of a claim under <u>Monell</u> requires separate analysis of two distinct issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so whether the [municipality] is responsible for that violation." <u>Collins v. City of Harker Heights, Texas</u>, 503 U.S. 115, 120 (1992).

A municipality may be liable for constitutional violations resulting from inadequate training or supervision of its employees if the failure to train amounts to a custom of the municipality. Such a failure must "amount[] to deliberate indifference to the constitutional rights of persons with whom the police come in contact." <u>Colburn</u>, 946 F.2d at 1028 (citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989)). To prove municipal liability on a theory of deliberate indifference is an especially difficult showing for a plaintiff to satisfy where the plaintiff has alleged that insufficient training or supervision has caused constitutional violations.  <u>Reitz v. County of Bucks</u>, 125 F.3d 139, 145 (3d Cir. 1997).  Such a showing requires that "(1) municipal lawmakers know that employees will confront a similar situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." <u>Carter v. City of Phila.</u>, 181 F.3d 339, 357 (3d Cir. 1999).  Moreover, the plaintiff proceeding on such a theory must establish that the municipality's "deliberate conduct . . . was the 'moving force' behind the injury alleged." <u>Reitz</u>, 125 F.3d at 145

(quoting <u>Brown</u>, 520 U.S. at 404).   The need for training, supervision, or other corrective action to avoid imminent deprivations of a constitutional right "must be so apparent that any reasonable policymaker or supervisor would have taken appropriate preventive measures."   <u>Horton v. City of Harrisburg</u>, No. 06-2338, 2009 U.S. Dist. LEXIS 63428, *13 (M.D. Pa. July 23, 2009) (quoting <u>Strauss v. Walsh</u>, No. Civ. A. 01-3625, 2002 U.S. Dist. LEXIS 24717, 2002 WL 32341791, at *3 (E.D. Pa. Dec. 17, 2002)).   Additionally, in order to recover for municipal liability on a failure-to-train theory, the alleged failure must be "closely related to the ultimate (constitutional) injury."   <u>Woloszyn</u>, 396 F.3d at 325.

The Supreme Court has recently reaffirmed the guiding principles which define municipal civil rights liability based upon a failure to train or oversee police. In <u>Connick v. Thompson</u>, – U.S.– , 131 S.Ct. 1350, 1359 (2011), the Court described the parameters of municipal liability in the following terms:

> A municipality or other local government may be liable . . .if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. See <u>Monell v. New York City Dept. of Social Servs.</u>, 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." <u>Pembaur v. Cincinnati</u>, 475 U.S. 469, 479(1986) . . . . They are not vicariously liable under § 1983 for their employees' actions. . . . Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. <u>Monell</u>, 436 U.S., at 691. Official municipal policy includes the decisions of a government's lawmakers, the acts of its

policymaking officials, and practices so persistent and widespread as to practically have the force of law. . . . . These are "action[s] for which the municipality is actually responsible." <u>Pembaur, supra</u>, at 479–480.  In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. See <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell* "). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." . . . . Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983. . . . " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." . . . . Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.

<u>Id</u>.(some citations deleted).

While this is a very exacting standard, we find that disputed factual issues prevent us from recommending summary judgment on the plaintiffs' claims that the borough's lack of training and oversight of the police rose to the level where it may be deemed deliberate indifference.

In this regard, it is conceded that, at the time of Vega's death, the Borough of

Shenandoah had absolutely no written policies, procedures, training programs or practices in place regulating use of force and treatment of arrestees. Furthermore, the borough had appointed defendant Matthew Nestor as chief of police, making Nestor the senior officer in this department. While the borough appears to concede these facts, it has asserted that municipal liability may not flow from the actions of defendant Matthew Nestor as chief of police because in November 2004, the Pennsylvania Borough Code generally provided that, "[t]he mayor of the borough shall have full charge and control of the chief of police and the police force, and he shall direct the time during which, the place where and the manner in which, the chief of police and the police force shall perform their duties." 53 P.S. § 46121. Focusing on this statutory formalism, the borough asserts that it simply cannot be held accountable as a municipality for the alleged actions of Nestor and others under his command and direction.

The plaintiffs' rejoinder to this argument is a twofold one: First, the plaintiffs observe as a legal matter that under Pennsylvania law, "[t]he mayor may, however, delegate to the chief of police or other officers supervision over and instruction to subordinate officers in the manner of performing their duties." 53 P.S. § 46121. Having noting that the law permits a mayor or municipality to delegate its police training and oversight responsibilities to the chief of police, the plaintiffs argue that

45

the Borough of Shenandoah had effectively abdicated and delegated these responsibilities to Nestor in 2004, citing the testimony of a witness who reported an alleged conversation with the Shenandoah  mayor regarding abuses in the police department which occurred shortly before Vega's death in which the witness claims that she was informed by the mayor that "if I rat out a police officer I will be the person that has to move out of town. . . ." (Doc. 208-6, p.53.)

We find that this testimony–which we concede is vigorously disputed by the borough–creates a factual issue regarding whether responsible city officials had effectively delegated their statutory duties regarding police training and conduct to the chief of police in the period immediately preceding Vega's death. In our view, this hotly contested testimony also creates a disputed issue of fact regarding whether the borough was displaying deliberate indifference to police excesses. Indeed, we believe that this proffered testimony, if credited by a fact-finder, would permit, but not compel, a conclusion that the borough was deliberately indifferent to these police excesses since a senior borough official is alleged to have told a complaining citizen that her sole recourse with respect to these excesses was that "if I rat out a police officer I will be the person that has to move out of town. . . ." (Doc. 208-6, p.53.)

On these facts, we simply cannot conclude as a matter of law that the plaintiffs have failed to meet their burden in showing that there are disputed material facts

46

relating to the question of municipal liability. Therefore, this motion for summary judgment should be denied.

Litigation is a search for the truth and for justice. Sometimes that truth reveals itself with a clarity that permits a judgment by a court as a matter of law. In other instances, the truth and justice can only be found through the dispassionate wisdom of a jury in its assessment of the facts. With respect to the death of David Vega, we find that the truth, and justice, ultimately lie in a jury's assessment of the facts.

### IV.   <u>Recommendation</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the defendants' Motions for summary judgment (Docs. 177, 189, 192) should be GRANTED in part, and DENIED, in part, as follows:

Summary judgment should be granted with respect to Counts II, IV and XII of the plaintiffs' complaint, which relate to allegations of false arrest, and Count X of the complaint, which asserts claims based upon alleged violations of the Pennsylvania constitution. As to the remaining counts of the complaint, we recommend that the motions be denied since there are substantial disputes regarding material facts which preclude summary judgment at this time.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 15th day of September, 2011.

*S/Martin C.  Carlson*
Martin C. Carlson
United States Magistrate Judge